FILED

2011 Dec-20  AM 11:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **LEA BOYD,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **vs.** | ) | |
| | ) | Civil Action Number |
| **BURLINGTON COAT** | ) | **2:10-cv-1983-AKK** |
| **FACTORY,** | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND MEMORANDUM OPINION

Before the court are Burlington Coat Factory's ("Burlington") Motion for Summary Judgment, doc. 13, and Motion to Strike evidentiary material submitted by Lea Boyd ("Boyd") in her opposition to the summary judgment motion, doc. 21.  Based on the reasons stated herein, the motion for summary judgment is **GRANTED**, as it relates to the state law claim for outrage, and **DENIED**, in all other respects.  The motion to strike is **DENIED**.  This matter is set for a pretrial conference on **January 26, 2012 at 10:00 a.m.** in the chambers of the undersigned and trial on **March 19, 2012 at 9:00 a.m.** at the Hugo L. Black U.S. Courthouse, Birmingham, Alabama.

## I.    STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald*

*Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).
Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's
position will not suffice; there must be enough of a showing that the jury could
reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.
1990) (citing *Anderson*, 477 U.S. at 252).

## II.   FACTUAL AND PROCEDURAL HISTORY

This suit arises from Boyd's employment with Burlington.  Burlington hired
Boyd on May 18, 2009, as a part-time Receiving Associate at its Crestwood
Boulevard store in Birmingham, Alabama.  Doc. 15-1, at 12.  The predominate
factual issues in this litigation concern Boyd's interactions with her supervisor
Terrence Stewart ("Stewart").  Boyd maintains, although Burlington disputes, that
on the first day of her employment, Stewart asked Boyd out to lunch and
continued doing so for two weeks despite Boyd's consistent refusals.  Doc. 18-5 ¶
5.  On two different occasions, Stewart offered to give Boyd money to purchase
lunch.  Doc. 15-1, at 28.  Stewart also sent Boyd text messages every morning or
almost every morning.  *Id.* at 26.  The messages included statements such as "can't
wait to see you at work" and "how are you doing, sweetie." *Id.*  Stewart sent Boyd
text messages after work as well, although the number and contents are in dispute.
Doc. 19 ¶ 2; doc. 23 ¶ 2.  Boyd told Stewart to stop sending the text messages, and
Stewart stopped for a period of time, but subsequently resumed sending Boyd
messages.  Doc. 15-1, at 27.

In addition, on multiple occasions while unpacking merchandise, Stewart

held up lingerie and said to Boyd, in front of other employees, "[t]his will look good on you, this color will fit you, I'd like to see you in that." *Id.* Boyd contends that Stewart made other sexually suggestive comments and gestures including statements to Boyd about the size of her breasts, and asking her if he could "taste [her] breast milk," and if her "pussy was wet like aquafina." Doc. 18-5 ¶ 6. Subsequently, in early June 2009, Stewart sent Boyd a text message that said "Good morning, baby, would you like breakfast?" Doc. 15-1, at 25. This text message instigated an altercation between Boyd and her boyfriend, and Boyd, who was pregnant, went to the hospital that morning due to Braxton-Hicks contractions following the altercation. *Id.* Upon her return to work, Steward told Boyd that "I'm glad you're back. I miss you. I couldn't wait to see you." *Id.* at 24. Stewart then leaned over, put his arm around Boyd, and kissed her on the corner of the mouth. *Id.* Boyd pushed Stewart away warning him against such conduct. *Id.* at 42-43. Subsequently, Stewart send Boyd a text message stating that he could treat her better than her boyfriend. *Id.* at 27. Boyd also contends that Stewart changed Boyd's work schedule so that the two would work alone together, *id.* at 33; however, Burlington disputes the frequency and justification for such scheduling changes. Doc. 23 ¶ 6.

After the kissing incident, Boyd discussed Stewart's conduct with co-associate Tara Robinson ("Robinson"). Doc. 15-1, at 23. Boyd asked Robinson to tell Gyvonna Jones ("Jones") about these events. The parties dispute whether Jones supervised Boyd at the time, *see* doc. 14 ¶ 9; doc. 19 ¶ 9, but do not dispute

that Burlington authorized Jones to receive sexual harassment complaints, *see* doc. 19 ¶ 11; doc. 23 ¶ 11.  Boyd and Robinson explained Stewart's conduct to Jones, and Robinson asserted that Stewart previously harassed other female employees. Doc. 15-1, at 26.  Boyd requested that Jones report Stewart to Brenda Jackson, the Operations Manager ("Jackson").  *Id.*  That same day, Jones met with Jackson to discuss the sexual harassment complaints made by Boyd and Robinson.  Doc. 15-5, at 17.  Later that day, Jackson met with Stewart, but the parties dispute the substance of this meeting.  Doc. 14 ¶ 16; doc. 19 ¶ 16.  Following Boyd's complaint to Jones, Stewart began "nitpicking" Boyd by, among other things, chiding Boyd about minor tardiness, sending Boyd home early, and issuing Boyd a "write up."  Doc. 15-1, at 29.

This nitpicking led Boyd to request a meeting with Jackson, Jones, and Stewart.  *Id.*  At this meeting, which took place in the accounting office, Boyd discussed the text messages, kissing incident, and nitpicking.  *Id.* at 30.  Stewart apologized and promised to discontinue his inappropriate behavior, and Boyd verbally accepted this apology.  *Id.*  However, the parties dispute whether Jackson or Jones gave Boyd any other option besides accepting Stewart's apology.  Doc. 14 ¶ 19; doc. 19 ¶ 13.  In any event, after Stewart's apology, Jackson said she would not take this matter to District Manager Sandra Callahan ("Callahan"), and would instead "keep this inside the store and throw it under the rug.  We're not going to go outside the store with this because we already have too many problems."  Doc. 15-1, at 32.  Sometime after this meeting, as Stewart and Boyd

walked though double doors into the Receiving Department, Stewart put his left hand around Boyd's waist, asking her "You all right today?"  *Id.* at 31.  Boyd told Stewart to remove his arm; Stewart complied and apologized.  *Id.*

In August 2009, Burlington transferred Boyd from Receiving to the Sportswear Department, doc. 15-1, at 16, allegedly to accommodate her pregnancy.  Receiving associates unload trucks, open boxes, scan boxes, hang and ticket items, and must be able to lift forty pounds or more.  *Id.* at 14-15.  Boyd was two months pregnant when Burlington hired her on May 18, 2009.  Sometime thereafter, Boyd's doctors placed her on lifting restrictions during her second trimester.  *Id.* at 16.  The parties dispute whether Boyd could still perform her job duties as a Receiving associate with these lifting restrictions.  *See* doc. 14 ¶ 2; doc. 19 ¶ 2.  A factual dispute also exists as to the reasons for Boyd's transfer; however, Jackson told Boyd that the transfer occurred because Burlington needed to reinstate another associate returning from maternity leave.  Doc. 15-1, at 16.  In any event, Boyd did not request a transfer from Receiving, *id.* at 17, and the parties dispute whether the job duties in Sportswear are more physically arduous for a pregnant woman than those in Receiving.  Doc. 23 ¶ 24; doc. 18-5 ¶ 9.  Moreover, while Burlington never told Boyd that the transfer occurred to accommodate her pregnancy restrictions, Callahan testified that Burlington in fact transferred Boyd to accommodate the lifting restrictions, which Burlington could not provide in Receiving.  Doc. 15-4, at 10.

Also in August 2009, shortly after the transfer, Boyd called the corporate

office and complained about the harassment, her transfer, and Stewart's

nitpicking.  Doc. 15-1, at 31-32.  Callahan learned of Boyd's internal complaints

in late September 2009 and began addressing Boyd's complaint in October 2009.

Doc. 15-4, at 18-19.  Callahan interviewed Stewart and Jackson, and, presumably

after substantiating Boyd's complaints, Callahan counseled Stewart regarding

Burlington's harassment policy, the use of personal text messages, and physical

contact with employees.  *Id.* at 17.  Also, Callahan emailed her findings to Glenn

Hodge in Burlington's human resources department.  *Id.*  At the time of her

investigation, Callahan had no knowledge of prior complaints against Stewart by

other female employees, *id.* at 23, even though, other women, in fact, complained

about Stewart's behavior, *see* doc. 19 ¶ 16.  The parties dispute whether these

complaints occurred before or after Boyd's complaint.  *See* doc. 23 ¶ 16.  Lotasha

Head and Christina Powell stated that Stewart made inappropriate passes and

sexual comments to them.  Doc. 15-5, at 28; doc. 18-6, at 5.  Both women reported

Stewart's conduct to Jones, and Jones discussed these complaints with Stewart.

*Id.*  The parties dispute whether Burlington's harassment policy required Jones to

report harassment complaints to her superiors, but it is undisputed that Jones did

not report these complaints to higher management.  Doc. 19 ¶¶ 20-21; doc. 23 ¶¶

20-21.

     In December 2009, after further complaints against Stewart, Glenn Hodge

and Dennis Bowie (Burlington human resource officers) began an investigation.

Thereafter, based on Boyd's complaints, and interviews with other women who

also complained about Stewart, Burlington terminated Stewart.  *See* doc. 18-2;

doc. 23 ¶ 37.

During Boyd's orientation, she received and signed Burlington's

Harassment Policy, which states in relevant part:

> I agree that if I witness or am advised of conduct that could violate
> the policy, whether that conduct was directed at me or not, I will
> immediately report that incident in writing to any one of the
> following: my supervisor, Store Manager, District Manager, or
> Regional Manager.  In addition, I will also advise the Director of
> Human Resources or the Chief Operating Officer at Corporate
> Headquarters in Burlington, New Jersey.  I acknowledge that it is my
> responsibility to read and fully understand the Policy Against
> Unlawful Discrimination and Harassment and to comply with it to the
> best of my ability.

Doc. 15-2, at 6.  Moreover, the 2008 Burlington Employee Policy Handbook

establishes:

> All employees have the right of redress for unlawful discrimination or
> harassment.  In order to invoke this right, a complaint should be
> provided by the employee to any one of the following: his/her
> immediate supervisor, the Store Manager, the District Manager and/or
> Regional Manager and/or the Regional HR Business partner . . . as
> soon as possible after the occurrence of any incident the employee
> believes is prohibited.  The complaint should include the details of
> the incident(s), the name(s) of the individual(s) involved, and the
> name(s) of any witness(es).

Doc. 18-1, at 1.  The parties agree that Burlington never specifically trained Jones

on how to handle sexual harassment complaints.  *See* doc. 19 ¶ 21; doc. 23 ¶ 21.

Moreover, while Jones read and reviewed Burlington's sexual harassment policy,

*see* doc. 15-5, at 31, the parties dispute the required procedures for Jones under

this policy.  *See* doc. 19 ¶ 21; doc. 23 ¶ 21.  The parties also dispute the extent of sexual harassment training that Stewart received.  *See* doc. 19 ¶ 38; doc. 23 ¶ 38.

Boyd originally filed suit in the Circuit Court of Jefferson County, Alabama, alleging federal discrimination claims under Title VII for (count I) a hostile work environment based on sex and (count II) retaliation, and state law claims for (count III) assault and battery, (count IV) invasion of privacy, and (count V) outrage.  Doc. 1, at 11-14.  Burlington removed the suit to this court pursuant to 28 U.S.C. §§ 1331, 1367, and 1441(b).  Burlington now moves for summary judgment on all claims.  Doc. 13.  Burlington also moves to strike portions of the evidentiary materials Boyd filed in opposition to the summary judgment motion.  Doc. 21.  The motions are fully briefed, *see* docs. 19, 23, 24, 25, and ripe for adjudication.

### III.    ANALYSIS

**A.    Burlington's Motion to Strike**

The court first addresses Burlington's motion to strike portions of Boyd's Declaration, doc. 18-5, for allegedly (1) contradicting prior sworn deposition testimony, (2) not being relevant or material, (3) containing subjective, speculative, and conclusory statements, or (4) constituting allegations raised for the first time in Boyd's summary judgment opposition.  *See* doc. 21.  The court finds Burlington's contentions unpersuasive and **DENIES** the motion.

Burlington argues that certain statements in the Declaration unambiguously contradict Boyd's sworn deposition testimony.  Doc. 21, at 2.  Accordingly,

Burlington cites *Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984), for the proposition that "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." However, the Eleventh Circuit also instructs that this "rule is applied 'sparingly because of the harsh effect [it] may have on a party's case.'"  *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1316 (11th Cir. 2007) (quoting *Rollins v. TechSouth*, 833 F.2d 1525, 1530 (11th Cir. 1987) (alteration in original)).  Indeed, "'to allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the . . . affiant . . . was stating the truth.'" *Id.* (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986) (alteration in original)).  Thus, courts must find some inherent inconsistency before completely disregarding an affidavit.  *Id.*

Turning now to the specific allegations, Burlington moves to dismiss three statements because they allegedly contradict sworn deposition testimony.  *See generally* doc. 21, at 7-10.[1]  While these statements certainly support Boyd's

---

[1] The alleged "inconsistent" statements are:

"On the first day of my employment at Burlington, Mr. Stewart approached me about eating lunch.  I was uncomfortable with his offer and refused to have lunch

allegations of a hostile work environment and sexual harassment, Burlington

argues that they do not appear in Boyd's deposition testimony.  Specifically,

Burlington maintains that "[o]n no less than three occasions during her sworn

deposition, Boyd was asked if there was anything else that Stewart did that she

believes supports her sexual harassment claim, and on each such occasion," she

failed to describe the occurrences listed in the Declaration.  *Id.* at 7; *see also id.* at

8, 9, 10.  Moreover, Burlington claims that "Boyd provides no explanation as to

her current recollection of Stewart's behavior, and/or why she did not recall these

allegations at the time of her deposition."  *Id.* at 8 (citing *Latimer v. Roaring Toyz,*

*Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) ("A court may determine that an

affidavit is a sham when it contradicts previous deposition testimony and the party

submitting the affidavit does not give any valid explanation for the

contradiction.")).

---

with him.  Despite this refusal, Mr. Stewart approached me on each day during the
first two weeks of employment."  Doc. 18-5 ¶ 5.

"Mr. Stewart began making sexually suggestive comments and giving me sexually
suggestive looks and gestures.  Specifically, he made comments about the size of
my breasts and if he could taste my breast milk.  While making these comments,
he would stare at my breasts.  He also asked me if 'my pussy was wet like
aquafina.'"  Doc. 18-5 ¶ 6.

"After I was moved to the sportswear department, Mr. Stewart would make visits
to the department and give me suggestive looks."  Doc. 18-5 ¶ 10.

*See* doc. 21, at 7-10.

Contrary to Burlington's contentions, the statements in Boyd's Declaration do not blatantly *contradict* sworn deposition testimony; rather, Boyd offers specific instances of conduct that she subsequently recalled after her deposition. *See* doc. 24, at 2-4.  Indeed, during Boyd's deposition, when counsel for Burlington inquired into further instances of harassment, Boyd asserted that she described the events that she could remember.  *See* doc. 15-1, at 31, 37, 43-44. The court is unwilling to strike statements from Boyd's Declaration when these statements constitute a minor "failure in memory or variation in a witness' testimony."  *Allen*, 495 F.3d at 1316.   Put differently, "[t]his is the type of inconsistency that [Burlington] should test through cross-examination at trial and allow the jury to weigh in determining the credibility of [Boyd's] testimony in support of [] her claims."  *Id.* at 1317.

Burlington also moves to strike as "not relevant or material" Boyd's statement in her Declaration that the "move to the sportswear department involved greater physical tasks.  In fact, I had to bend frequently and pick-up objects off of the floor.  I was no longer allowed to take sit-down breaks as I was previously allowed in the receiving department."  Doc. 21, at 4 (quoting doc. 18-5 ¶ 9). Burlington contends that this statement is irrelevant because Boyd "never claimed that her job responsibilities in the Sportswear department violated her doctor's 10-15 pound lifting restrictions."  Doc. 21, at 9.  Boyd disagrees and maintains that this statement demonstrates that Burlington's "articulated reason for transferring [Boyd] out of Receiving, to accommodate her pregnancy, was pretexual."  Doc.

24, at 4-5.  *See also* doc. 14, at 27.  Without addressing the merits of the retaliation claim, the court agrees that Boyd's statement is at least relevant to the issue of pretext and denies Burlington's motion to strike it on relevancy grounds.  *See* FED. R. EVID. 401; *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1196 (11th Cir. 1997) (providing that, in Title VII retaliation claims, if defendant offers a legitimate reason for the adverse employment action, plaintiff must demonstrate that such "legitimate reason" is actually a "pretextual ruse to mask a retaliatory action").

Furthermore, Burlington contends that the court must strike portions of Boyd's Declaration because they "contain subjective, speculative, and conclusory statements."  Doc. 21, at 4.  The Eleventh Circuit establishes that "conclusory allegations without specific supporting facts have no probative value."  *Leigh v. Warner Brothers, Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (quotation marks and citations omitted).  Burlington maintains that two statements in the Boyd Declaration constitute such speculation—"Mr. Stewart began making sexually suggestive comments and giving me sexually suggestive looks and gestures" and "After I was moved to the sportswear department, Mr. Stewart would make visits to the department and give me suggestive looks."  *See* doc. 21, at 7, 9 (quoting doc. 18-5 ¶¶ 6, 10).  Contrary to Burlington's contention, these statements are not conclusory; rather, they simply state the alleged conduct Boyd maintains created a sexually hostile work environment.

Finally, Burlington moves to strike portions of Boyd's Declaration because

Boyd purportedly "assert[s] a new retaliation claim" that she did not include in her original EEOC Charge.  Doc. 21, at 9.  The statement in question is Boyd's contention that the "move to the sportswear department involved greater physical tasks.  In fact, I had to bend frequently and pick-up objects off of the floor.  I was no longer allowed to take sit-down breaks as I was previously allowed in the receiving department."  *Id.* (quoting doc. 18-5 ¶ 9).  Burlington contends that this statement exceeds the scope of Boyd's EEOC Charge, constitutes a contention raised for the first time in opposition to summary judgment, and must be stricken. *Id.*  The court disagrees.  Judicial claims must "'amplify, clarify, or more clearly focus the allegations in the EEOC complaint.'"  *Minix v. Jeld-Wen, Inc.*, 237 F. App'x 578, 588 (11th Cir. 2007) (quoting *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004)).  Indeed, the proper question is "[w]hether the claims pursued in the judicial proceeding are 'like or related to, or grew out of, the allegations contained in [the employee's] EEOC charge.'"  *Id.* (quoting *Gregory*, 355 F.3d at 1280).

Boyd's complaint alleges retaliation by Burlington after she reported Stewart to management.  Doc. 1 ¶ 27.  Boyd's EEOC Charge provides that "[i]n response to my complaints of the unwelcome sexual environment, my employer retaliated against me, including, *but not limited to*, cutting the number of scheduled hours given to me."  Doc. 21-1, at 3 (emphasis added).  In other words, Boyd did not undertake to specifically limit the alleged retaliatory conduct to the actions outlined in her EEOC retaliation charge.  Boyd's statement in her

Declaration, regarding the conditions of her position in Sportswear, does not establish a different or distinct allegation of retaliation.  Rather, it pertains to the supposedly adverse nature of these conditions—the very essence of Boyd's retaliation claim alleged in both her EEOC Charge and complaint.  Therefore, the motion to strike this and other portions of the Declaration is **DENIED**

## B.    Hostile Work Environment

As it relates to Boyd's actual claims, first, Boyd contends that Burlington subjected her to a hostile work environment in violation of Title VII.  Doc. 1 ¶ 19. The Eleventh Circuit instructs that a "hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  To establish a hostile work environment claim for sexual harassment, a plaintiff must prove:

> (1) [T]hat he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999); *see also Baldwin*

*v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1292 (11th Cir. 2007) (regarding the fifth *Mendoza* element, "[e]mployers generally are liable for a supervisor's sexual harassment if the harassment is severe and pervasive enough to result in a hostile work environment amounting to discrimination prohibited by Title VII").

Burlington maintains that Boyd cannot establish a hostile work environment claim because the alleged harassment was not based on sex and was not sufficiently severe and pervasive.  The court has considered the pleadings, the parties' submissions, and the relevant law, and determines that genuine issues of material fact remain with respect to this hostile work environment claim.  Among other things, the parties disagree as to the nature, frequency, and severity of Stewart's alleged conduct, and whether Burlington responded effectively to Boyd's complaint.  *See generally* docs. 18-5, 19, 23; *see also Mendoza*, 195 F.3d at 1246-47.  Accordingly, as it relates to Burlington's contention that Boyd cannot establish that Burlington subjected her to a hostile work environment, the motion for summary judgment is **DENIED**.

C.    ***Faragher/Ellerth* Defense**

Alternatively, Burlington asserts that, even if the court finds against it on the hostile work environment claim, it is due to prevail because of the *Faragher/Ellerth* affirmative defense.  *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).  "An employer avoids liability under this defense if: (1) it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior'; and (2) the

employee 'unreasonably failed to take advantage of any preventive or corrective opportunities [it] provided.'" *Baldwin*, 480 F.3d at 1303 (quoting *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765) (alteration in original).  Burlington contends that it exercised reasonable care to prevent and correct any sexual harassment by Stewart, and that Boyd unreasonably failed to take advantage of its preventative policies.  Doc. 14, at 22-25.  The court disagrees.  First, genuine issues of material fact exist as to whether Burlington exercised reasonable care to correct and prevent sexual harassment.  In particular, the parties dispute the extent of Burlington's supervisory training regarding the handling of sexual harassment complaints and how Burlington communicated the harassment policies to its employees and supervisors.  Doc. 19 ¶¶ 21, 38; doc. 23 ¶¶ 21, 38.  Moreover, a dispute exists about whether Burlington received sexual harassment complaints against Stewart prior to Boyd's allegations, and, if so, the adequacy of Burlington's response to these complaints.  Doc. 19 ¶¶ 16, 20-21; doc. 23 ¶¶ 16, 20-21.  Finally, the parties dispute the reasonableness of Burlington's response to Boyd's complaints.  Doc. 14 ¶ 19; doc. 19 ¶ 13.  Stated simply, Boyd presents sufficient evidence for a jury to find, if it is so inclined, that Burlington did not exercise reasonable care to prevent or correct Stewart's sexual harassment of female employees.

Second, there is a genuine issue of material fact as to the reasonableness of Boyd's conduct in reporting the sexual harassment.  Burlington alleges that Boyd failed to utilize its sexual harassment policy because she did not submit a *written*

complaint as required by the policy.  However, the employee handbook makes no reference to a written complaint.  Doc. 18-1, at 1.  Rather, it requires only that the employee *complain*.  *Id.*  It is undisputed that Boyd complained to a person Burlington designated to receive sexual harassment complaints—Jones.  Doc. 19 ¶ 11; doc. 23 ¶ 11. Moreover, as requested by Boyd, Jones reported the conduct to the Operations Manager, Jackson, who purportedly told Boyd that she would not take the issue to upper management and would "keep this inside the store and throw it under the rug."  Doc. 15-1, at 32; doc. 15-5, at 17.  In light of these complaints to Jones and Jackson, the court simply refuses to agree with Burlington that Boyd failed to take advantage of preventative mechanisms because she did not submit a written complaint.  This is instead a determination for a jury.  Accordingly, Burlington may raise the *Faragher*/*Ellerth* affirmative defense at trial, but insofar as it moves the court for summary judgment on this defense, the motion is **DENIED**.

**D.    Retaliation**

In addition to the hostile work environment claim, Boyd contends that Burlington retaliated against her for complaining about Stewart by transferring her from Receiving to Sportswear.  Doc. 1 ¶ 27.  To establish a Title VII claim for retaliation, Boyd must demonstrate "(1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal link between the protected expression and the adverse action."  *Raney*, 120 F.3d at 1196.  If this prima facie case is made, then the burden shifts to Burlington to demonstrate legitimate, non-

retaliatory reasons for the adverse employment action.  *Id.*  Assuming such legitimate reasons are provided, "[a]t the summary judgment stage, the burden then shifts back to [Boyd] to raise a genuine factual issue as to whether the defendant's proffered reason is a pretextual ruse to mask a retaliatory action."  *Id.* Burlington argues that Boyd fails, as a matter of law, to assert any adverse employment action or, in the alternative, a causal link between her complaint to Jones concerning Stewart's behavior and this alleged adverse action.  Doc. 14, at 25-27.

Taking all reasonable inferences in favor of the non-moving party, the court finds that a factual dispute exists as to both the adverse employment action and the justifications for such action.  *See* doc. 19, at 30-34.  Regarding an "adverse" employment action, the parties dispute whether Boyd suffered a decrease in hours after her transfer to Sportswear, *see* doc. 1 ¶ 22, and whether Boyd's transfer resulted in more arduous and physically demanding job duties for a pregnant woman, *see* doc. 19, at 31; doc. 18-5; doc. 23 ¶ 24.  A reasonable jury could conclude that such employment actions effectively dissuade employees from complaining about hostile work environments.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006) (utilizing an objective, totality of the circumstances test to ascertain "adverse employment actions" because the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed").

Moreover, while Burlington maintains that it transferred Boyd for non-retaliatory reasons, i.e. "to accommodate her [pregnancy-based] lifting restrictions and make room for Randrika Parker's return to Receiving from a pregnancy leave," doc. 14, at 27, Boyd raises a reasonable inference of pretext. Specifically, Boyd points out that Burlington produced no documentation of an accommodation. Moreover, assuming the job duties in Sportswear are more arduous, Boyd asserts that the physical "accommodation" justification appears inconsistent with the facts. *See* doc. 19, at 32-33. Ultimately, a jury is best apt to decide these factual disputes regarding the "adverse" nature of Boyd's transfer and whether Burlington possessed legitimate reasons for the transfer. *See Raney*, 120 F.3d at 1196. Therefore, Burlington's summary judgment motion on the retaliation claim is also **DENIED**.

## E.     State Law Claims

Boyd also brings common law claims against Burlington for assault and battery, invasion of privacy, and outrage. Doc. 1 ¶¶ 29-39. Boyd contends that "Burlington is vicariously liable for Stewart's underlying tortious conduct." Doc. 19, at 34. "'For [an employer] to become liable for [the] intentional torts of its agent, the plaintiff[ ] must offer evidence that [1] the agent's wrongful acts were in the line and scope of his employment; or [2] that the acts were in furtherance of the business of [the employer]; or [3] that [the employer] participated in, authorized, or ratified the wrongful acts.'" *Potts v. BE & K Const. Co.*, 604 So. 2d 398, 400 (Ala. 1992) (quoting *Joyner v. AAA Cooper Transp.*, 477 So. 2d 364, 365

(Ala. 1985) (alterations in original)).  Boyd relies on the legal theory that Burlington implicitly "ratified" Stewart's conduct because Burlington possessed actual knowledge of his previous tortious conduct against other employees, but failed to take reasonable remedial action.  Doc. 19, at 37.  *See Potts*, 477 So. 2d at 400.[2]

### i.    Assault and Battery

Boyd alleges two instances of assault and battery—Stewart "kissing her and putting his hand on her waist."  Doc. 19, at 34.  Alabama law requires a plaintiff alleging "assault and battery" to prove "'(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.'"  *Harper v. Winston Cnty.*, 892 So. 2d 346, 353 (Ala. 2004) (quoting *Ex parte Atmore Cnty. Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998)).  "The wrong here consists, not in the touching, so much as in the manner or spirit in which it is done . . . . Thus, to lay hands on another in a hostile manner is a battery, although no damage follows; but to touch another, merely to attract his attention, is no battery and not unlawful."  *Harper*,

---

[2] "Although this Court has not established explicitly what must be shown to prove that an employer has implicitly 'ratified' or 'tolerated' one employee's sexual harassment of another employee, we now hold that in addition to proving the underlying tortious conduct of an offending employee, a complaining employee must show that the employer (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation." *Potts*, 604 So. 2d at 400.

892 So. 2d at 353-54 (quotations marks and citations omitted).

Boyd contends that Burlington is liable for Stewart's conduct because Burlington ratified it.  As shown below, the court finds that Burlington did not "ratify" the first allegation of assault and battery (Stewart kissing Boyd), but that Boyd presents sufficient evidence for the second allegation (Stewart putting his hand on Boyd's waist) to survive Burlington's summary judgment motion.

Even when taking all inferences in favor of Boyd, a reasonable jury could *not* conclude that—prior to Stewart kissing Boyd—Burlington had *actual knowledge* of Stewart engaging in conduct that would constitute actionable assault and battery.  *See Potts*, 604 So. 2d at 400.  While Burlington may have known that Stewart verbally harassed female employees with sexual innuendo, *see* doc. 19, at 15, there is no evidence that Stewart touched or threatened to touch another employee in an offensive or harmful manner.  Accordingly, because Boyd fails to satisfy her evidentiary burden regarding Burlington's knowledge that Stewart previously committed assault and battery, Burlington did not implicitly "ratify" Stewart's conduct when he kissed Boyd.

However, after Boyd reported Stewart's conduct to Jones, Burlington gained "actual knowledge of the tortious conduct of the offending employee."  *See Potts*, 604 So. 2d at 400.  As such, given Stewart's previous interactions with Boyd that she reported to Burlington, a reasonable jury could find that Burlington ratified Stewart's decision subsequently to put his hand on Boyd's waist. Obviously, before a finding of ratification, Boyd must first establish that a battery

occurred.  Again, a battery requires a harmful or offensive touching which

"'consists [of] an injury actually done to the person of another in an angry or

revengeful or rude or insolent manner.'"  *Harper*, 892 So. 2d at 353 (quoting

*Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986)).  Indeed, in *Atmore*

*County*, the Alabama Supreme Court found that plaintiff presented sufficient

evidence to survive summary judgment where defendant "touched her waist,

rubbed against her when passing her in the hall, poked her in the armpits near the

breast area, and touched her leg."  719 So. 2d at 1194.  Additionally, plaintiff

"presented evidence indicating that each of these touchings was intentional, was

conducted with sexual overtones, and was unwelcome."  *Id.*  Similarly here,

shortly after Boyd reported Stewart and told Stewart that she considered his

conduct offensive, Stewart intentionally wrapped his arm around Boyd; an action

both unwelcome and conducted with sexual overtones.  *See* doc. 15-1, at 31.  The

court finds this evidence sufficient to survive summary judgment, especially

considering that "when the evidence as to whether a battery in fact occurred is

conflicting, the question whether a battery did occur is for the jury."  *Harper*, 892

So. 2d at 353.

    Finally, Burlington also argues that Boyd cannot establish that it ratified

Stewart's alleged battery because it took "adequate" steps to remedy the initial

tortious conduct.  *See* doc. 14, at 32-33 (citing *Potts*, 604 So. 2d at 400).

Specifically, Burlington contends that "Boyd admits that Jackson resolved her

initial complaint to Boyd's satisfaction . . . ."  *Id.* at 33.  Essentially, Burlington

argues that because it addressed Boyd's complaint, she cannot show that Burlington ratified Stewart's conduct.  Burlington's argument, however, misses the mark because Boyd presents sufficient evidence for a jury to find that Burlington failed to respond adequately.  First, a jury will have to resolve whether simply requiring an apology from an individual with previous complaints of sexual harassment is an "adequate response."  Second, Boyd provides evidence that Burlington offered her no other alternative but to accept the apology, doc. 19 ¶ 13, and, significantly, that Jackson refused to report the allegations to higher management because of her concerns about how it would impact the store in light of the store "already hav[ing] too many problems."  Doc. 15-1, at 31-32.  This is likewise a disputed issue for a jury to resolve.  Therefore, the court **DENIES** Burlington's motion for summary judgment regarding the assault and battery claim.

     *ii.    Invasion of Privacy*

     Boyd's invasion of privacy claim "is premised upon [the] species of invasion known as a wrongful intrusion into one's private activities."  *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 651 (Ala. 1986).  *See also* doc. 19, at 35. Alabama law defines this tort as "the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities."  *McIsaac*, 495 So. 2d at 651. Significantly, "severe sexual harassment can be an invasion of privacy." *Armstrong v. Standard Furniture*, 197 F. App'x 830, 834 (11th Cir. 2006) (citing

*Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 324 (Ala. 1989)).  In *Busby*, a supervisor engaged in severe and pervasive sexual harassment including "obscene and sexually suggestive remarks, gestures, and propositions, as well as physical contact with the plaintiffs."  *Mills v. Wex-Tex Indus., Inc.*, 991 F. Supp. 1370, 1384 (M.D. Ala. 1997) (citing *Busby*, 551 So. 2d at 324).  The Alabama Supreme Court found that a "jury could reasonably determine from this evidence that [the supervisor] pried or intruded into the plaintiffs' sex lives in an offensive or objectionable manner and thereby invaded their right of privacy."  *Busby*, 551 So. 2d at 324.  Moreover, in *Mills*, the Middle District of Alabama found sufficient evidence of privacy intrusion or sexual harassment to survive summary judgment where defendant "grabbed [plaintiff's] breasts and buttocks, pinched her, tried to pull her into his office, and pinned her against the wall and tried to kiss her.  In addition, [defendant] repeatedly sent [plaintiff] suggestive notes, called her at work and at home, and visited her residence."  991 F. Supp. at 1384.

Similarly here, Boyd presents sufficient evidence for a jury to conclude that Stewart engaged in severe and pervasive sexual harassment such that he objectionably intruded into her privacy.  Allegedly, Stewart made comments about seeing Boyd in lingerie, doc. 15-1, at 27; asked Boyd if he could taste her breast milk and whether her "pussy was we like aquafina," doc. 18-5 ¶ 6; forcibly kissed Boyd, doc. 15-1, at 24; and for the first few months of Boyd's employment, frequently sent text messages to her inquiring into personal matters with sexual innuendo, doc. 15-1, at 26.  Such allegations, if credited by the jury, are sufficient

to maintain an invasion of privacy claim.

Moreover, a reasonable jury could conclude that—prior to Stewart's harassment of Boyd—Burlington had actual knowledge of Stewart sexually harassing other female employees.  For example, Christina Powell testified that between October of 2007 and November of 2008, Stewart commented on her breasts once or twice a day.  Doc. 18-6, at 4-5.  Stewart also purportedly asked Powell, an eleventh grader at the time, "you mean to tell me no one has ever went down on you."  *Id.* at 5, 6.  Although Powell reported this conduct to Jones, apparently Powell did not request that Jones report Stewart's conduct to any upper management personnel.  *Id.* at 6.  However, as a supervisor, Jones' knowledge of potential sexual harassment is imputed to Burlington,[3] and  "'an employer's failure to stop the tortious conduct after it learns of the conduct will support an inference that the employer tolerated the conduct.'"  *East Ala. Behavioral Medicine, P.C. v. Chancy*, 883 So. 2d 162, 170 (Ala. 2003) (quoting *Potts*, 604 So. 2d at 400).  Accordingly, there is a jury question as to whether Burlington ratified Stewart's invasion of Boyd's privacy by failing to take adequate remedial measures when armed with actual knowledge of previous tortious conduct.  Therefore, Burlington's motion on the invasion of privacy claim is **DENIED**.

### iii.    Outrage

Finally, to establish the underlying tort of outrage, Boyd must demonstrate

---

[3] *See Henry v. Georgia-Pacific Corp.*, 730 So. 2d 119, 121 (Ala. 1998) (under Alabama law, knowledge of a supervisor is imputed to the employer).

that Stewart's conduct was "so extreme and outrageous in degree 'as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Moore v. Spiller Associated Furniture, Inc.*, 598 So. 2d 835, 837 (Ala. 1992) (quoting *Am. Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1981)).  Indeed, "'[t]he tort of outrage is a very limited cause of action that is available only in the most egregious circumstances.'" *Mills*, 991 F. Supp. at 1385 (quoting *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993)).  Regarding sexual harassment and the tort of outrage, Judge Robert Propst of the Northern District of Alabama concluded that:

> The Alabama Supreme Court has suggested, however, that limited forms of sexual harassment do constitute outrage. Mere requests for sexual favors are not sufficient.  Nor are demands which, if refused, carry a consequence of economic loss or loss of status at employment sufficient.  However, when the sexual impositions are not merely verbal or economic, but become physical impositions, the harasser is no longer attempting to request sexual favors (in exchange for job security), but is instead attempting to force sexual liberties. An employee can decline even the most obscene request to be touched in a sexual manner. An employee cannot decline a physical act that has already occurred. At that point, the harasser's conduct goes beyond the simply base and oversteps the tolerable bounds of a civilized society.

*Brewer v. Petroleum Suppliers, Inc.*, 946 F. Supp. 926, 936 (N.D. Ala. 1996) (citations omitted).  While Stewart did touch Boyd in a sexual manner by kissing her, Boyd presents no evidence that Burlington ratified such conduct.[4]  Evidence

---

[4] After Stewart kissed Boyd and Boyd reported this incident to management, Burlington had actual knowledge of plausibly "outrageous" conduct.  However, Boyd provides no evidence

regarding Stewart's conduct *before* the interactions with Boyd may sufficiently establish an invasion of privacy claim, but, even taking all reasonable inferences in Boyd's favor, Stewart's previous behavior was not so egregious to constitute "outrage" because his sexual impositions did not manifest into physical impositions.  Therefore, the court **GRANTS** Burlington's motion as it relates to the claim for outrage.

## IV.   CONCLUSION

At the summary judgment phase, the court offers no view as to the proper outcome of this case.  However, taking all inferences in the light most favorable to the non-moving party, Boyd satisfies her burden of producing enough evidence such that a reasonable jury could return a verdict in her favor on all claims except outrage.  *See Anderson*, 477 U.S. at 248, 255.  Accordingly, Boyd may proceed to a jury trial for her hostile work environment, retaliation, assault and battery, and invasion of privacy claims against Burlington.

**DONE** the 20th day of December, 2011.

_____

**ABDUL K. KALLON**

UNITED STATES DISTRICT JUDGE

---

of subsequent occurrences that overstep the tolerable bounds of a civilized society.  Stewart wrapping his arm around Boyd may constitute assault and battery, *see supra*, but such conduct does not rise to the level of outrage.